976 A.2d 349

Douglas M. ARMSTRONG, et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 107, Sept. Term, 2008.

Court of Appeals of Maryland.

July 23, 2009.

J. Carroll Holzer (Holzer & Lee, Towson), on brief, for petitioners/cross–respondents.

Adam S. Levine, Asst. City Solicitor, and Sandra R. Gutman, Chief Solicitor (George A. Nilson, City Solicitor, Baltimore City Dept. of Law, Baltimore), on brief, for respondents/cross–petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA,* JOHN C. ELDRIDGE, (Retired, specially assigned) and IRMA S. RAKER, (Retired, specially assigned), JJ.

HARRELL, Judge.

This case is one of several legal challenges brought by a group of residents of Baltimore City's Remington/Charles Village neighborhood against a developer and the Mayor and City Council of Baltimore ("the City") regarding the governmental approval processes for a seven-story residential apartment building (Cresmont Loft) on Cresmont Avenue. Here we are concerned with the residents' petition for judicial review challenging the City's Ordinance 04–659 (approving a parking lot for Cresmont Loft), on the basis that the process by which it was enacted violated the Maryland Open Meetings Act. For reasons we shall explain, we conclude that the Open Meetings Act challenge, insofar as the challenge seeks to undo the approval of the parking lot, is moot by virtue of the enactment of subsequent legislation by the City rendering Ordinance 04–659 unnecessary as a matter of law. Although, as a result of this holding, we are not compelled to address the parties' dispute over the award of attorney's fees under the Open Meetings Act, we choose to comment (albeit as dicta) on this dispute for the guidance of the parties and the trial court when the latter considers the matter.

---

* Barbera, J., participated in the hearing and conference of this case, but recused herself prior to the adoption of this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Preceding the Instant Case

Cresmont Properties Ltd. ("Cresmont") owns a 28,132 square-foot parcel of land (the "Property") located at 2807–35 Cresmont Avenue in Baltimore City. Petitioners, a group of local residents opposed to Cresmont's development of the Property,[1] challenged in various administrative and judicial fora three construction permits, as well as an occupancy permit, issued by the City to Cresmont for construction and operation of an apartment building known as Cresmont Loft. A more fulsome history of the issuance of these permits and challenges, than is necessary for the present litigation, is supplied in our opinion in the companion case of *Armstrong v. Mayor and City Council of Baltimore*, —— Md. ——, —— A.2d ——, 2009 WL 2178672 (2009), filed today immediately prior to this opinion. The present case derives from one of the Petitioners' legal challenges to the third construction permit and pertains specifically to the on-site parking lot.

#### 1. First Construction Permit

On 15 November 2002, the Zoning Administrator for the Baltimore City Department of Housing and Community Development ("DHCD") issued to Cresmont a permit to construct a seven-story residential apartment complex consisting of twenty-six apartments and a parking lot with thirty-three parking spaces. At the time, the Property was a vacant lot.

---

1. The "Petitioners" for the purposes of this appeal are Douglas M. Armstrong, Joan L. Floyd, Howard B. McElwain, Jorge A. Gonzalez, F. Ernesto Kellum, Glen D. Gaddy, Jeffrey Groden–Thomas, and Wendi Groden–Thomas, who, as a group of local residents opposed to the Cresmont development, were the captioned plaintiffs of the Open Meetings Act Petition for Judicial Review filed in the Circuit Court for Baltimore City pursuant to Md.Code, State Government Art. § 10–501 to –512 ("Open Meetings Act") (2004 Repl. Vol. & Supp. 2008). These plaintiffs may not be identical to those of the numerous other actions stemming from the Cresmont development. For the sake of clarity, we shall refer here to the plaintiffs challenging the development throughout these numerous actions as "Petitioners."

Petitioners filed a negative appeal [2] to the Board of Municipal and Zoning Appeals (the "Board"). They alleged, among other things, that the project violated § 10–504(a) [3] of the Zoning Code of Baltimore City ("the Code" or "the Zoning Code"), which, at the relevant time, required passage of an ordinance by the City to authorize the use of land as a parking lot. The Board ruled against Petitioners, reasoning that § 10–504(a) did not apply to accessory off-street parking for newly-erected structures. Construction of the building and parking lot began in August 2003.

On 4 November 2003, however, the Circuit Court for Baltimore City, on Petitioners' petition for judicial review, reversed the Board, concluding that the Code did not exempt accessory uses from the requirements of § 10–504(a). Shortly thereafter, the Director of Permits for the DHCD revoked

---

**2.** Negative appeals are "[a]ppeals to prohibit buildings or uses, permits for which have been approved or issued by the Zoning Administrator [of Baltimore City]." *See* Department of Municipal and Zoning Appeals, Rules Relative to Appeals from the Action of and Applications Referred by the Zoning Administrator, para. 6.

**3.** Section 10-504 of the Zoning Code of Baltimore City provides:

(a) *In general.*

In the Parking Lot Districts, no land may be used as a parking lot nor may any building be razed so as to permit the use of the land as a parking lot unless authorized by an ordinance of the Mayor and City Council.

(b) *Considerations.*

This requirement is to permit the Mayor and City Council, while considering the proposed ordinance, to consider and evaluate:

(1) the need for the parking lot;

(2) the proposed appearance of the parking lot; and

(3) possible aesthetic damage to the area surrounding the parking lot, with particular respect to the proposed removal of historic or aesthetically valuable properties.

At the time Petitioners initiated their challenge premised on § 10–504 of the Zoning Code, § 10–501 of the Code defined "parking lot" as:

In this subtitle, "parking lot" means land used for the off-street parking of 3 or more motor vehicles, together with the adjoining and perimeter areas required by this subtitle or by any other law of Baltimore City.

In January 2005, the City Council amended § 10–501's definition of "parking lot," an action that has a direct bearing on the present case, as we shall explain. *See infra* Part I.C.

Cresmont's construction permit. The City, which sided with Cresmont in the litigation, appealed to the Court of Special Appeals. The intermediate appellate court dismissed the appeal on the ground that the provision of the Code authorizing judicial review was not in effect when the City filed its appeal. *Mayor of Balt. v. Armstrong*, No. 02096, September Term 2003, 163 Md.App. 704 (filed 10 Aug. 2005).

### 2. Second Construction Permit

The circumstances surrounding the second construction permit may be found in *Armstrong v. Mayor and City Council of Baltimore*, 409 Md. 648, 653–54, 976 A.2d 349, 352–53, 2009 WL 2178672 (2009). Suffice it to say, for present purposes, that as a result of administrative and judicial litigation over its issuance, a third construction permit was issued.

### B. Ordinance 04–659 and the Third Construction Permit: The Present Litigation

The Property is located in the City's Parking Lot District II, a special district created by § 10–503 of the Zoning Code.[4] At the times relevant to these proceedings prior to the City's amendment of § 10–501's definition of "parking lot," discussed *infra*, § 10–504 of the Zoning Code prohibited land in Parking Lot District II from being used as a parking lot "unless authorized by an ordinance of the Mayor and City Council."[5]

Because of this requirement, on 27 October 2003, Bill 03–1228 ("the Bill") was introduced in the City Council. The purpose of the Bill was to authorize, as a conditional use, a parking lot on the Property. After introduction, the Bill was assigned to the Council's Land Use and Planning Committee ("Committee"), after consideration by the Baltimore City

---

**4.** Section 10–503 of the Zoning Code provides, in considerable detail, for two Parking Lot Districts, Districts I and II, identifying each specific street which borders the Districts.

**5.** *See supra* note 3. We are advised that construction of the Property has been completed, the apartments leased, and the parking lot at issue is in operation and use by the residents of the building.

Planning Commission. Following its consideration, in a staff report dated 4 December 2003, the Commission stated:

> The applicants are requesting this conditional use [B]ill because several community residents have taken this project to court regarding the use of an alley, and because they are concerned about this same group challenging them regarding the Parking Lot District provisions in the Zoning Code. The City would not normally require this conditional use ordinance because the parking to be provided is accessory to the apartment building. The applicants simply wish to ensure that they may proceed with their project and are willing to provide the higher level of scrutiny afforded the community in the ordinance process, if that would speed the project's implementation.

The staff report recommended that, before passage by the City Council, the Bill be amended to provide that "the plans and landscaping plans [provided by Cresmont be] attached to, and made part of the [B]ill."

Sections 16–401 and 16–402 of the Zoning Code required, prior to action by the full Council on the Bill, the Committee to consider the proposed conditional use at a public hearing.[6]

---

6. Section 16–401 of the Zoning Code provided:
> (a) *In general.*
> The City Council may not place a bill proposing any zoning legislation on its second reading calendar until:
> (1) except as specified in subsection (b) of this section, it has received written reports and recommendations from the Board and the Planning Commission; and
> (2) the bill has been considered by a committee of the City Council, at a public hearing held in accordance with this subtitle.
> (b) *Agency failure to report.*
> (1) If the Board or the Planning Commission fails to submit its written report and recommendations within the period specified in § 16–302 { "Agency reports and recommendations" } of this title, the City Council may proceed without that report and recommendations.
> (2) However, the applicant may waive this time limit and consent to an extension of the reporting period by giving written notice of the waiver and consent to the President of the City Council, with copies to the Board, the Planning Commission, and the Zoning Administrator.
> Section 16–402 of the Zoning Code provided:

Rules 10–9 and 10–10 of the Rules of the City Council required the Committee to report the Bill to the City Council after acting on it.[7] If the Committee proposed to amend

---

(a) *Hearing required.*

For a bill proposing any zoning legislation, the committee to which the bill has been referred must conduct a hearing at which:

(1) the parties in interest and the general public will have an opportunity to be heard; and

(2) all agency reports will be read.

(b) *Public notice.*

At least 15 days' notice of the time, place, and subject of the hearing must be given by each of the following methods, as applicable:

(1) for all zoning legislation, by publication in a newspaper of general circulation in the City;

(2) for any legislative authorization, by posting on the property in question; and

(3) for any change in the boundaries of a zoning district:

(i) by posting at a place within the district as the Department of Planning designates;

and

(ii) by first class mail to the persons who appear on the tax records of the City as the owners of the properties subject to the change.

(c) *Responsibility for notice.*

The notices required by this section must be given by and at the expense of:

(1) in the case of a bill proposing any legislative authorization, the applicant for that authorization; and

(2) in all other cases, the City Council.

7. Rule 10–9 of the Rules of the City Council of Baltimore provided:

(a) *In general.*

Each committee must report to the Council on all bills on which it has taken action.

(b) *Options.*

The report on each bill must be either:

(1) favorable;

(2) favorable with amendments;

(3) unfavorable; or

(4) without recommendation.

(c) *Adoption.*

A committee may adopt a report only on the affirmative vote or written assent of a majority of all committee members.

Rule 10–10 provided:

(a) *In general.*

The chair of the committee must report a bill to the floor of the City Council at the next regular meeting after the committee's action on the bill.

(b) *Exception.*

substantively the Bill after the first hearing, it was required to hold another hearing.[8]

The Bill was the subject of a Committee public hearing on 4 February 2004. Although notice of the hearing had been duly posted at the Property and on the City's website, only the Chair of the Committee and one other Committee member were present at the hearing on behalf of the Committee.[9] That hearing lasted nearly three hours and was attended by about forty-five other individuals, including some of the Petitioners. During the hearing, the Committee did not adduce or discuss site plans for the proposed parking lot. According to an affidavit in the record filed by Joan L. Floyd, one of the Petitioners, "[a]t the hearing, the chair of the Committee made a statement to the effect that the [opponents] of Bill 03–1228 could not expect there to be any further public meetings or hearings on Bill 03–1228."

No further public Committee hearing or work session was held in fact. Rather, on 4 March 2004, in a report submitted to the City Council, the Committee recommended that the Bill be enacted as amended.[10] One of the amendments included a

---

Subsection (a) of this rule does not apply if:
 (1) the committee otherwise directs; or
 (2) the committee's action on the bill was taken too late to meet the next meeting's deadline for submitting reports.

8. Section 16–403 of the City Code provided:
 (a) *Rehearing required.*
 (1) Except as specified in subsection (b) of this section, whenever a bill proposing any zoning legislation is amended after the public hearing, another public hearing must be held on the bill as amended.
 (2) The requirements of this subtitle for notice and for reading of agency reports apply to any additional hearing required by this section.
 (b) *Exception.*
 An additional hearing is not required for:
 (1) an amendment made in Committee; or
 (2) any amendment that consists only of a change in punctuation, grammar, or spelling and does not in any way alter the substance of the ordinance.

9. An affidavit in the record of a Council member reveals that a majority of Committee members at the time was four members.

10. This report included the signatures of the Committee Chair and three Committee members who had not attended the 4 February 2004

detailed site plan of the parking area, a plan to which no reference was made at the 4 February hearing. The site plan had been obtained by the Committee subsequent to the public hearing, as had a follow-up City agency report addressing the issue of accessibility to the neighbors' garages impacted potentially by the proposed development of the Property. The report, conducted by a Transportation Department employee, was intended to "advise the [Committee] regarding existing and proposed rights-of-way between adjacent properties and the proposed development site." It concluded that "the proposed development [will] not harm[ ]" access to adjacent garages. Petitioners contended that the measurements relied on in the report to form the basis of its conclusion were erroneous.

The Committee's method of amending and approving the Bill, after the 4 February session, was through the collection of signatures of a quorum of mostly Committee members who had not attended the hearing. According to an affidavit of the Bill's co-sponsor:

[ ] As is common practice in the City Council, a vote was not taken at the Committee hearing with regard to the adoption of a Committee Report on this [B]ill. Instead, the method by which the Committee adopted its March 4, 2004 Report of "favorable as amended" with regard to Council Bill 03–1228 was through the collection of the written assent of at least a majority of the Committee's members-in this case the signature of four Committee members, of which I was one.

[ ] As is common practice in the City Council, one of the clerks circulated the [B]ill among the Committee's members to collect these four signatures. There was never a second meeting of the Committee after the public hearing held on February 4, 2004 with regard to this legislation.

Thus, the quorum of the Committee that recommended that the Bill be enacted as amended, including the detailed site

---

hearing. The "blue backing," or reverse side of the bill, contains the words "Committee report as of March 4, 2004–Favorable as amended."

plan and in reliance on the agency report, did so: (1) without having vetted the disputed agency report or detailed site plan before the public at the hearing; (2) without having discussed the amendments suggested by members of the public at the 4 February meeting or explaining why they were rejected; and (3) without having presented or discussed in open session the amendments made subsequently. The only evidence of the Committee's deliberations and decision-making process were the signatures of the four members who signed the backing of the Bill.

As a result of the Committee's recommendation, the Bill was advanced to the full City Council. On 8 March 2004, the amended version of the Bill passed second reader. On 15 March, Petitioners delivered to the City Council President a letter relating Petitioners' position that the Committee approved "amendments that had not been the subject of a public hearing" and "plans that did not meet minimum statutory requirements ... and that constituted an unlawful taking of the property of adjacent owners," and that the Committee acted on the basis of an "inaccurate and misleading agency report ... without a public open meeting of the Committee as required by the State Open Meetings Act." The letter asked the Council President to "remedy the situation by taking immediate measures to void the action of the City Council Land Use and Planning Committee on Bill 1228 and either withdraw the [B]ill, or table it and schedule it for an open public re-hearing and Committee vote." No direct response was forthcoming. At the next City Council meeting, on 22 March 2004, Bill 03–1228 passed on the third and final reading. On 25 March, it was signed into law as Ordinance 04–659.

Petitioners filed a timely complaint in the Circuit Court for Baltimore City, alleging that the City violated Md.Code, State Government Art. § 10–501 to –512 ("Open Meetings Act") (2004 Repl. Vol. & Supp. 2008).[11] The relief Petitioners sought

---

11. Petitioners also filed a judicial review action in the Circuit Court for Baltimore City challenging the passage of Ordinance 04–659 by the City

included a declaration that Bill 03–1228 and Ordinance 04–659 were void, that the City Council be enjoined from issuing any permits pursuant to Ordinance 04–659, and that Petitioners be awarded reasonable attorney's fees.[12] The City and Cresmont

Council. Maryland Code, Article 66B § 2.09(a)(1) (1957, 2003 Repl. Vol. & Supp. 2008), provides that an appeal may be filed in the Circuit Court for Baltimore City by any person aggrieved by a "zoning action" taken by the City Council. On 13 August 2004, the Circuit Court dismissed Petitioners' suit, reasoning that it did not have jurisdiction because Ordinance 04–659 did not constitute a "zoning action."

Petitioners appealed to the Court of Special Appeals. The City moved to dismiss the appeal in the intermediate appellate court, under Maryland Rule 8–602(a)(1), as an appeal "not allowed by these rules or other law," reiterating its argument that Ordinance 04–659 did not constitute a "zoning action." The Court of Special Appeals agreed and dismissed the appeal. We remanded the case to the intermediate appellate court, noting that, because the Circuit Court entered a final appealable judgment, the Court of Special Appeals had appellate jurisdiction to consider the issue of whether the Circuit Court had jurisdiction in the first instance. *Armstrong v. Baltimore City, Md.*, 390 Md. 469, 475, 889 A.2d 399, 403 (2006).

On remand, the Court of Special Appeals reversed the Circuit Court, concluding that Ordinance 04–659 "ha[d] the characteristics of a conditional use." *Armstrong v. Mayor of Balt.*, 169 Md.App. 655, 672, 906 A.2d 415, 425 (2006). Accordingly, the action of the City Council was administrative in nature and subject to judicial review as a "zoning action." *Id.* at 674, 906 A.2d at 426. On remand to the Circuit Court, the trial judge dismissed the petition as moot, in light of adoption of the subsequent zoning ordinance text amendment, Ordinance 04–855, *see* discussion *infra*, which amended the definition of a "parking lot" to exclude accessory parking. Petitioners again appealed to the Court of Special Appeals. That case remains pending in the intermediate appellate court at this time. *Armstrong v. Mayor of Balt.*, No. 01682, September Term 2008.

12. Section 10–510 of the Open Meetings Act of the State Government Article provides:
 (a) *Scope of section.*—(1) This section does not apply to the action of:
 (i) appropriating public funds;
 (ii) levying a tax; or
 (iii) providing for the issuance of bonds, notes, or other evidences of public obligation.
 (2) This section does not authorize a court to void an action of a public body because of any violation of this subtitle by another public body.
 (3) This section does not affect or prevent the use of any other available remedies.
 (b) *Petition authorized.*—(1) If a public body fails to comply with § 10–505, § 10–506, § 10–507, § 10–508, or § 10–509(c) of this

filed motions to dismiss on the ground that, because the Committee did not convene a quorum of its members to discuss the proposed bill, the Open Meetings Act did not apply. The Circuit Court rejected the City's and Cresmont's

subtitle any person may file with a circuit court that has venue a petition that asks the court to:

(i) determine the applicability of those sections;

(ii) require the public body to comply with those sections; or

(iii) void the action of the public body.

(2) If a violation of § 10–506, § 10–508, or § 10–509(c) of this subtitle is alleged, the person shall file the petition within 45 days after the date of the alleged violation.

(3) If a violation of § 10–505 or § 10–507 of this subtitle is alleged, the person shall file the petition within 45 days after the public body includes in the minutes of an open session the information specified in § 10–509(c)(2) of this subtitle.

(4) If a written complaint is filed with the Board in accordance with § 10–502.5 of this subtitle, the time between the filing of the complaint and the mailing of the written opinion to the complainant and the affected public body under § 10–502.5(g) of this subtitle may not be included in determining if a claim against a public body is barred by the statute of limitations set forth in paragraphs (2) and (3) of this subsection.

(c) *Presumption.*—In an action under this section, it is presumed that the public body did not violate any provision of this subtitle, and the complainant has the burden of proving the violation.

(d) *Authority of court.*—A court may:

(1) consolidate a proceeding under this section with another proceeding under this section or an appeal from the action of the public body;

(2) issue an injunction;

(3) determine the applicability of this subtitle to the discussions or decisions of public bodies;

(4) if the court finds that a public body willfully failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of this subtitle and that no other remedy is adequate, declare void the final action of the public body;

(5) as part of its judgment:

(i) assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred; and

(ii) require a reasonable bond to ensure the payment of the assessment; and

(6) grant any other appropriate relief.

(e) *Petition.*—(1) A person may file a petition under this section without seeking an opinion from the State Open Meetings Law Compliance Board.

(2) The failure of a person to file a complaint with the Board is not a ground for the court to either stay or dismiss a petition.

position, concluding, in a written opinion, that the Committee's actions with regard to the passage of Ordinance 04–659 were in violation of the Open Meetings Act:

> In this Court's view, the Committee, in this case, violated the Open Meetings Act in spirit and in fact. The Committee conducted business with a quorum of its members when it circulated the Bill for signatures of members who were going to vote in favor of sending the Bill to the City Council with a favorable report. This was done in private and away from the public's view, in violation of the essence of the Open Meetings Act. *Community and Labor United For Baltimore Charter Committee (CLUB) v. Baltimore City Board of Elections*, 377 Md. 183, 186–87, 832 A.2d 804 (2003), and Md.Code Ann. State Govt[.] Art., § 10–501. Further evidence of this is highlighted by the fact that the Bill was signed by three members who did not attend the February 4, 2004 meeting. The Committee sent the Bill to the City Council and recommended it as "favorable as amended." By amending the Bill, a reasonable inference can be drawn that there was discussion or should have been discussion among the members of the Committee in order to enable a quorum to agree to recommend the Bill. At the February 4, 2004 meeting, the Chair requested further information from the city agency who conducted the access and egress of the alleys abutting the parking lot. There is no record that this information was obtained. But it is unlikely that the request of the Committee Chair would have been be [sic] ignored by a city agency; and that this information played no role in the Committee's decision to recommend the Bill.
>
> While it is true a quorum is technically necessary to qualify as a meeting, the contention that a quorum is necessary to trigger the Act and open the meeting to the public is not the case. The totality of the circumstances surrounding each meeting in light of the purpose of the Act and its importance to the maintenance of a democratic society must be examined. By intentionally avoiding holding a meeting with the necessary number of participants to

establish a quorum, the Committee cannot avoid compliance with the Act. Md.Code Ann., State Govt. Art., § 10–501(a). The Legislature intended the Open Meetings Act to allow the general public to view the entire deliberative process. *Community And Labor United For Baltimore Charter Committee (CLUB)[,] et al. v. Baltimore City Board of Elections, et al.*, 377 Md. 183, 194, 832 A.2d 804 (2003). The Committee violated the Act by not performing "public business . . . in an open and public manner["], and not allowing citizens to observe "the deliberations and decisions that the making of public policy involves." Md.Code Ann., State Govt. Art., § 10–501(a)(2)(ii).

\* \* \*

[The City and Cresmont] argue that it is the routine for the City Council to circulate a Bill for signatures without holding a meeting. Merely because it is the practice of the City Council does [not] give legal justification for violating the Open Meetings Act.

\* \* \*

The actions of the Committee, in the subject case, do not involve minor changes, e-mail or "thinking out loud." This matter involves actual deliberations on whether a bill should be forwarded to the City Council as approved or disapproved. If the Act is only triggered by a meeting of a quorum at one time, then it would be possible for public officials to conduct business, by e-mail or in small groups, hold no meetings and never be subject to public scrutiny. A committee could hold a meeting, without a quorum to "think out loud," then circulate a proposed Bill from member to member without the public being permitted to observe any of the deliberative process. This is not consistent with the goal of the Open Meetings legislation as it would not allow citizens to "observe the performance of public officials and the deliberations and decisions that the making of public policy involves." Md.Code Ann.[,] State Govt. Art.[,] § 10–501(a). For these reasons, the Court finds that the Committee did violate the Open Meetings Act.

Next, this Court must consider the relief Petitioners request, that is, whether Bill 03–[1]128 and Ordinance 04–659 should be declared void in light of the violation.

\* \* \*

The Open Meetings Act does not allow this Court to void an action of a public body because there was a violation of this subtitle by another public body. Md.Code Ann., State Govt. Art., § 10–510(a)(2). Although the Committee serves the City Council[, t]he Land Use and Planning Committee and the City Council of Baltimore are separate public bodies. The City Council was free to conduct an inquiry and vote as it saw fit on Bill 03–1228.

\* \* \*

In the subject case, ... the subsequent lawful actions of the City Council cured the violation of the Open[ ] Meeting[s] Act by the Land Use and Planning Committee; and therefore the Petitioners' request to declare the passage of Bill 03–1228 and Ordinance 04–659 void is denied.

State Govt. [Art.,] § 10–510(d)(5) permits the award of reasonable counsel fees to the party who prevails in the action. In light of the Court's ruling that there was a failure to comply with the Open Meetings Act, counsel for Petitioners are awarded reasonable counsel fees to be paid by [the City].[13]

---

13. The court left for subsequent determination the amount of the award of attorney's fees. Footnote 8 of its Memorandum & Opinion stated that "[c]ounsel for Petitioners are to submit an accounting to the Court for a determination of the amount of fees to be awarded." The open question of the amount of attorney's fees does not deprive us of our jurisdiction to decide the case before us.

In *County Executive v. Doe*, 300 Md. 445, 479 A.2d 352 (1984), we explained that
under 42 U.S.C. § 1988, a claim for an attorney's fee, while an integral part of the remedy under 42 U.S.C. § 1983, is viewed as a collateral matter from the § 1983 action; thus the claim for an attorney's fee may be brought following a final judgment in a § 1983 action.
*Id.* at 451 n. 4, 479 A.2d at 355 n. 4.
That resolution of the amount of the award under the fee-shifting provisions of a statutory cause of action is a collateral matter separate

from the merits of the underlying claim, for purposes of determining appealability, was confirmed by this Court in *Maryland–National Capital Park and Planning Commission v. Crawford*, 307 Md. 1, 511 A.2d 1079 (1986). In *Crawford*, we concluded:

> State courts which have considered the proper procedure for dealing with counsel fee awards have reached varied conclusions, but they generally take the position that trial courts may award fees despite the fact that an appeal has been taken from the judgment on the merits and is pending.

*Id.* at 40, 511 A.2d at 1099.

The Court of Special Appeals addressed the issue of unadjudicated attorney's fees, in a case substantially similar in procedural posture to the present case, in *Larche v. Car Wholesalers, Inc.*, 80 Md.App. 322, 562 A.2d 1305 (1989). Appellees in *Larche* moved to dismiss appellant's appeal of his request for attorney's fees pursuant to his Magnuson–Moss Act claim because that claim was not resolved finally by the trial court. Citing to *Doe* and *Crawford*, the intermediate appellate court rejected appellees' position, opining:

> A claim for counsel fees as part of a suit under the Magnuson–Moss Act is clearly analogous to a claim for counsel fees in a § 1983 action. In both types of action, an award of counsel fees is not made by a jury but is entirely within the discretion of the trial judge and, being dependent on the merits of the claim, ordinarily would not even be considered until after the verdict on the underlying action. We hold, therefore, that a claim for attorneys' fees under § 2310(d)(2) of the Manguson–Moss Act is collateral to the principal action so that an appeal will lie from a final judgment on the underlying claim despite the pendency of a decision on the attorneys' fees claim.

*Larche*, 80 Md.App. at 327–28, 562 A.2d at 1308.

The conclusion that the award of attorney's fees is a collateral matter for purposes of appeal in certain actions has been extended to other contexts. *See Johnson v. Wright*, 92 Md.App. 179, 607 A.2d 103 (1992) (holding that, because an unadjudicated request for attorney's fees under Maryland Rule 1–341 was collateral to the merits of the actions between the parties, the plaintiffs' failure to appeal timely from the trial court's resolution of the parties' claims on the merits deprived the appellate court of jurisdiction to consider the appeal). Thus, the consensus of Maryland appellate decisions is that, if a claim for attorney's fees derives from statute or rule, that claim is "collateral" to the subject matter of the merits of the underlying substantive action, with the result that the continuing pendency of the claim for attorney's fees in the trial court does not deprive a ruling on the merits of the party's substantive claim of its status as an appealable judgment. *See also Blake v. Blake*, 341 Md. 326, 670 A.2d 472 (1996) (The absence of any determination by the trial court on the wife's claim for attorney's fees pursuant to Family Law Article § 12–103 did not deprive the court's 9 August 1993 judgment of finality, such that wife's appeal was not timely because it was not noted within 30 days of final judgment on the merits of the claims.); *Gallagher v. Gallagher*, 118 Md.App. 567, 703 A.2d 850 (1997) (Circuit Court did not err by reducing attorney's fee award under Family Law Article § 11–110 to judgment after appellant had

(footnotes omitted). Everyone was disappointed in some way or another with the trial court's rulings and, thus, all parties pursued appeals to the Court of Special Appeals. Petitioners argued that the Circuit Court should have "voided" Ordinance 04–659. The City and Cresmont argued that the Petitioners are not entitled to counsel fees.

On 2 July 2007, the Court of Special Appeals issued an unreported opinion in the matter. A panel of the intermediate appellate court determined that, although the City Council enacted Ordinance 04–855 in January 2005, which amended § 10–501 of the Zoning Code and thereby made no longer necessary the attainment of an ordinance to establish an accessory parking lot as a conditional use, as discussed *infra,* the present case was not moot. The intermediate appellate court agreed with the Circuit Court that the Committee violated the Open Meetings Act by recommending an amendment to Bill 03–1228 without first allowing the public an opportunity to hear the reasoning behind the recommendation. Further, the court agreed with the Circuit Court's conclusion that when a legislative committee meeting is closed to the public improperly, in violation of the Open Meetings Act, the City Council may rectify the violation by itself holding a proper public meeting on the bill. Thus, the intermediate appellate court determined that the City Council's subsequent actions, taken at public meetings, "cured" the violation committed by its Land Use and Planning Committee. Finally, the panel disagreed with the Circuit Court's determination that Petitioners are entitled to counsel fees. The Court of Special Appeals concluded that, because Petitioners did not achieve the relief they sought on the merits of their claims, they may not be considered a "prevailing" party, as required under Md.Code, State Govt. Art. § 10–510(d)(5), and, therefore, may not be awarded counsel fees. *Armstrong v. Mayor of Balt.,* No. 01243, September Term 2005, 175 Md.App. 762 (filed 2 July 2007).

---

noted his appeal to Court of Special Appeals because the reduction of the counsel fees to judgment was a collateral matter).

Petitioners filed a Motion for Reconsideration. The City, on the other hand, requested that the Court of Special Appeals's opinion be reported. On 25 August 2008, the court denied both requests.

On 9 September 2008, Petitioners filed with this Court a Petition for Writ of Certiorari. The City and Cresmont filed answers to the Petition requesting its denial. In its response, the City also included a "Conditional Cross–Petition." On 10 November 2008, we granted the Petitioners' Petition and the City's Cross–Petition.[14] *Armstrong v. Baltimore*, 406 Md. 442, 959 A.2d 792 (2008). Cresmont expressly declined to participate further in the present litigation.

---

**14.** Petitioners' successful Petition for Writ of Certiorari posed the following questions:

 1. Did the Court of Special Appeals err in ruling that in an action to enforce the Open Meetings Act, the party who proves an Open Meetings Act violation does not "prevail" within the meaning of § 10-510(d)(5)(i) so as to be eligible for consideration to receive an award of counsel fees?

 2. Did the Court of Special Appeals err in ruling that, while a City Council bill was advanced out of committee as a result of private deliberations that violated the Open Meetings Act, the City Council's subsequent public passage of the bill is a non-voidable final action?

 3. Did the Circuit Court err in ruling that the City Council and its Committee are separate bodies within the meaning of § 10-510(a)(2), so that the final action of the City Council may not be voided when its Committee has violated the Open Meetings Act?

The City's Conditional Cross–Petition framed the following questions:

 1. Did the Court of Special Appeals err in affirming the trial court's refusal to void the City Council's approval of an accessory parking lot where, although the intermediate appellate court agreed with the lower court that a Committee of the City Council had committed an Open Meetings Act violation, it found (as did the lower court) that the full City Council had not?

 2. Assuming the Court of Special Appeals was correct in affirming the trial court's refusal to void the City Council's approval of an accessory parking lot, did the intermediate appellate court nonetheless err in reversing the trial court's award of attorney's fees to Petitioners?

## C. Time Does Not Stand Still In City Hall:

### Ordinance 04–855

While the litigation over Ordinance 04–659 was spiraling on, the City Council got busy amending the Zoning Code to "clarify" whether a conditional use ordinance should be required for accessory parking lots in the Parking Lot Districts. On 20 October 2004, Bill 03–1219 was introduced in the City Council. The Bill was titled "Zoning–Parking Lot Districts– Clarification." Bill 03–1219 proposed to amend the definition of "parking lot" in § 10–501 of the Zoning Code by adding "non-accessory" to the statutory definition. Thus, under the amendment proposed in the Bill, it would no longer be necessary to enact a parking lot ordinance under § 10–504(a) to approve the construction of off-street accessory parking in the Parking Lot Districts [15] in order to comply with § 10–201 [16] of the Zoning Code.

Also on 20 October 2004, the Land Use and Planning Committee of the City Council held a hearing at which Bill 03–1219 was discussed. At that hearing, Douglas M. Armstrong ("Armstrong"), the lead Petitioner in this case and other cases related to the overall controversy at the heart of this case, presented the Committee with a portion of the legislative history of the Zoning Code, which indicated that, as part of a comprehensive recodification process in 1970, the City Council declined adopting an amendment similar to the one proposed

---

**15.** The proposed amended definition of "parking lot" in § 10–501 of the Zoning Code provided:

> In this subtitle, "parking lot" means land used for the non-accessory off-street parking of 3 or more motor vehicles, together with the adjoining and perimeter areas required by this subtitle or by any other law of Baltimore City.

Thus, the proposed change would exclude accessory parking lots from the ordinance requirement of § 10–504 because the "parking lot" covered by § 10–504 would no longer include accessory parking lots.

**16.** Section 10–201 of the Zoning Code provides:

> For all newly-erected structures and all newly-established uses of land, accessory off-street parking facilities must be provided for that structure and use, as required by this title.

in Bill 03–1219.[17] On 15 November 2004, the City Council held a work session on the Bill, and on 29 November 2004, approved the Bill. The Bill became law as Ordinance 04–855, effective 1 January 2005.

On 30 December 2004, Armstrong filed a complaint in the Circuit Court for Baltimore City seeking a declaratory judgment that Ordinance 04–855 was invalid and an injunction prohibiting the City from permitting construction of parking lots pursuant to the terms of the Ordinance. The Circuit Court, on 31 October 2005, entered an order dismissing Armstrong's request for an injunction and declaring that Ordinance 04–855 was not invalid.

Armstrong pursued a timely appeal of the Circuit Court's judgment to the Court of Special Appeals. He urged that the Circuit Court erred: (1) in ruling that Ordinance 04–855 was not invalid because the Ordinance violated the "one subject" rule contained in Article III, section 14(b) of the Baltimore City Charter;[18] (2) in failing to conduct an evidentiary hearing and granting the City's motion to dismiss; and, (3) in failing to enter a proper declaratory judgment. The Court of Special Appeals affirmed. The intermediate appellate court concluded that Armstrong was not entitled to an evidentiary hearing because the question of the Bill's titling and its compliance with section 14(b) of the City Charter is a question of law. Moreover, the titling of Bill 03–1219 complied with section 14(b) because the title was not misleading and sufficiently apprised the public, including Armstrong, of the purpose and contents of the Bill. Thus, the Court of Special

---

17. The proposed amendment from 1970 would have created an exception to the requirement that the City Council approve parking lots for any parking lot on the same property as, or within 300 feet of, a building served by the parking.

18. Art. III, § 14(b) of the Baltimore City Charter provides:
(b) *Single-subject, title, and content requirements.*
Every ordinance enacted by the City shall embrace but one subject, which shall be described in its title, and no ordinance shall be revived, amended or enacted by mere reference to its title, but the same shall be set forth at length as in the original ordinance.

Appeals concluded that Ordinance 04–855 was not invalid. *Armstrong v. Mayor of Balt.,* No. 02210, September Term 2005, 171 Md.App. 738 (filed 5 Oct. 2006). We denied Armstrong's Petition for Writ of Certiorari on 12 January 2007. *Armstrong v. Baltimore,* 396 Md. 524, 914 A.2d 768 (2007).

## II. DISCUSSION

### A. Mootness

▮ The City advances a threshold position that Petitioners' Open Meetings Act claim regarding Ordinance 04–659 is moot. The argument rests on the notion that Ordinance 04–855 amended subsequently (and while the instant litigation was pending) the underlying text of the Zoning Code and made it unnecessary for Cresmont to obtain a conditional use ordinance to establish the accessory parking lot. *See supra* Part I.C and note 15. Under the *Yorkdale* rule (from *Yorkdale Corp. v. Powell,* 237 Md. 121, 205 A.2d 269 (1964), as recently reaffirmed in *Layton v. Howard County Board of Appeals,* 399 Md. 36, 922 A.2d 576 (2007)), because the present litigation was ongoing at the time Ordinance 04–855 was enacted, the substantive zoning textual amendment applies retrospectively to this case, with the result that Cresmont does not need a separate ordinance to sanctify the construction of the parking lot associated with the Cresmont Loft. We agree with the City. Therefore, we reverse the judgment of the Court of Special Appeals insofar as the intermediate appellate court concluded that Petitioners' claim on the merits is not moot.

In *Layton,* 399 Md. 36, 922 A.2d 576, we reaffirmed the principal conclusion of *Yorkdale,* that "legislated change of pertinent law, which occurs during the ongoing litigation of a land use or zoning case, generally, shall be retrospectively applied." *Id.* at 38, 922 A.2d at 577. As there articulated:

> In *Yorkdale,* the Court addressed a situation in which a property owner (the Yorkdale Corporation) had negotiated the reclassification of the zoning of its property in order to build an apartment building. Yorkdale also applied for a

special exception and variance. The zoning commissioner granted Yorkdale's requests, with the exception of limiting the number of units in the apartment building, i.e., the density of the zoning. A neighborhood property owner appealed the Board's decision to the Circuit Court. There, the question was "whether the zoning ordinances . . . gave the zoning officials power to grant a variance as to density." *Yorkdale*, 237 Md. at 123, 205 A.2d at 270. The Circuit Court found that the then-current law did not authorize a variance in density. *Id.* at 124, 205 A.2d at 270. Yorkdale appealed to the Court of Appeals and, after argument, but before a decision was issued, a bill was passed by the county council modifying the law in respect to the granting of variances as to density. *Id.* Upon becoming aware of this event, the Court set the case for reargument.

In reaching its decision, the *Yorkdale* Court first stated that:

> "Maryland consistently has followed the rule that 'an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence,' as Judge Markell, for the Court, repeated in *Woman's Club v. State Tax Comm.*, 195 Md. 16, 72 A.2d 742 (or, it may be noted, even when a judgment wrong when rendered is made right by the change in the law). See also for this proposition that a change in the law after a decision below and before final decision by the appellate Court will be applied by that Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent, *Keller v. State*, 12 Md. 322; *Day v. Day*, 22 Md. 530; *Gordy v. Prince*, 175 Md. 688, 7 A.2d 611; *Cockerham v. Children's Aid Society*, 185 Md. 97, 43 A.2d 197; and *Tudor Arms Apts. v. Shaffer*, 191 Md. 342, 62 A.2d 346."

*Yorkdale*, 237 Md. at 124, 205 A.2d at 271. In discussing several zoning cases in which this rule had been applied, the *Yorkdale* court stated:

"It would seem to follow from the decisions in *Banner [v. Home Sales Co. D,* 201 Md. 425, 94 A.2d 264 (1953) ], *Lake Falls [Ass'n v. Board of Zoning Appeals of Baltimore County,* 209 Md. 561, 121 A.2d 809 (1956) ] and *Grau [v. Board of Zoning Appeals of Baltimore County,* 210 Md. 19, 122 A.2d 824 (1956) ] that an applicant for rezoning to a more intense use of his property, who has been successful before the zoning authorities and the circuit court does not acquire a vested or substantive right which may not be wiped out by legislation which takes effect during the pendency in this Court of the appeal from the actions below."

*Yorkdale,* 237 Md. at 126, 205 A.2d at 272.

Applying this reasoning to the case, and after analyzing the legislative intent of the county in its enactment of the new bill and determining that there was no evidence that the bill was not to be subject to retrospective application, the *Yorkdale* Court held that the change in the zoning law had made the case decided under the old law moot. Because the amended law had come into effect during the course of litigation (i.e., while the appeal was pending before a final judgment) the Court applied it retrospectively and dismissed Yorkdale's appeal. *Yorkdale,* 237 Md. at 133, 205 A.2d at 276.[19]

\* \* \*

*Yorkdale* and its progeny have never been overruled. They are still good law and are determinative in evaluating whether, in a land use or zoning case, a change in statutory

---

**19.** The Court in *Layton* noted that "[f]ollowing the Court's decision in *Yorkdale,* [this Court] ha[s] affirmed those principles in relation to land use and zoning cases several times." *Layton,* 399 Md. at 56, 922 A.2d at 587. The cases the Court cited in which the *Yorkdale* rule was applied included: *Anne Arundel County v. Maragousis,* 268 Md. 131, 299 A.2d 797 (1973); *Dal Maso v. Board of County Commissioners,* 264 Md. 691, 288 A.2d 119 (1972); *Springloch Area Citizens Group v. Montgomery County Board of Appeals,* 252 Md. 717, 251 A.2d 357 (1969); *Marathon Builders, Inc. v. Montgomery County Planning Board,* 246 Md. 187, 227 A.2d 755 (1967); and *Mandel v. Board of County Commissioners,* 238 Md. 208, 208 A.2d 710 (1965).

law taking place during the course of a litigated issue should have retrospective application. As discussed *supra*, we shall consider zoning cases based upon the law as it exists at the time the case is before us.

\* \* \*

The *Riverdale [Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987)]* Court was correct in the above statement. *Ordinarily*, we do construe statutes to operate prospectively, absent a clear legislative intent to the contrary. The *Riverdale* Court, however, did not address *Yorkdale*, the exception to the general rule. The *Riverdale* Court's "disapproval" of what it termed dicta from *Janda [v. General Motors Corp.*, 237 Md. 161, 205 A.2d 228 (1964), *overruled in part by Layton*, 399 Md. at 63, 922 A.2d at 592]* (a non-land use and non-zoning case) does not affect the *Yorkdale* rule. Any disapproval of *Janda's* fourth rule by the *River[dale]* Court was made in the context of the statute at issue in that case, which had no relation to land use and zoning issues. The exception to the general rule still stands. In land use and zoning cases, the law shall be applied as it is in effect at the time of argument. Therefore, respondents' reliance on *Riverdale* is misplaced.

\* \* \*

For the aforementioned reasons, we reaffirm the *Yorkdale* rule that a substantive change in relevant statutory law that takes place during the course of the litigation of a land use or zoning issue shall be retrospectively applied by appellate courts.

*Layton*, 399 Md. at 53–56, 58, 64–65, 70, 922 A.2d at 586–87, 589, 593–94, 596 (footnotes omitted). In the present case, there is no doubt that Ordinance 04–855 is relevant statutory law concerning "a land use or zoning issue." As such, we apply here the *Yorkdale* rule, with the result that the substantive change to the definition of "parking lot" in § 10–501 of the Zoning Code applies retrospectively to the approval requirements for the parking lot at issue here.

Applying the change enacted in Ordinance 04–855 retrospectively to the present case renders moot Petitioners' present challenge to the issuance of the parking lot authorization to Cresmont without a validly enacted conditional use ordinance. As we explained, *supra* in footnote 15, Ordinance 04–855 amended the definition of "parking lot" in § 10–501 of the Zoning Code to provide:

> In this subtitle, "parking lot" means land used for the *non-accessory* off-street parking of 3 or more motor vehicles, together with the adjoining and perimeter areas required by this subtitle or by any other law of Baltimore City.

(emphasis added). Thus, the change excludes accessory parking lots from the separate ordinance requirement of § 10–504 because the "parking lot" to which § 10–504 now refers no longer would embrace accessory parking lots. Simply put, the separate ordinance requirement of Title 10 of the Zoning Code, the requirement that supported previously Petitioners' present challenge, no longer stands as a hurdle to Cresmont's construction and use of the parking lot here. *See, e.g., Suter v. Stuckey*, 402 Md. 211, 219–20, 935 A.2d 731, 736 (2007) ("A case is moot when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." (citing *Dep't of Human Res. v. Roth*, 398 Md. 137, 143, 919 A.2d 1217, 1221 (2007); *Att'y Gen. v. Anne Arundel County Sch. Bus Contractors Ass'n*, 286 Md. 324, 327, 407 A.2d 749, 752 (1979))).

## B. Petitioners' Exceptions to Ordinance 04–855 Rendering Their Challenge Moot

Petitioners advance three considerations which, they allege, spare their present challenge from being moot: (1) the parking lot may not be "accessory"; (2) the parking lot cannot be an "accessory" use to an unlawful or non-permitted structure; and (3) two other sections of the Zoning Code act as a prohibition against non-permitted or unauthorized uses of land or erection of structures from becoming permitted or made lawful due to subsequent text amendments to the Zoning

Code. We reject Petitioners' considerations for the reasons that follow.

### 1. Is The Parking Lot "Accessory"?

Petitioners assert that "[i]t is a fallacy to assume or presume that the parking for ... Cresmont [Loft] is 'accessory,'" and that "*[such a] determination cannot be made based on the record of this matter.*" (emphasis in original) (footnote omitted). Petitioners' apparent position is that no determination has been made previously on this record as to whether the parking lot at issue falls under the Zoning Code's definition of "accessory." [20] Presumably, Petitioners want us to remand the case for that determination. We decline the invitation.

Although Petitioners' argument that the City has not decided this question is not wholly untenable, it is in stark contrast to the intent and wording of Bill 03–1228, as well as the 4 December 2003 staff report of the Baltimore City Planning Commission. The "Recitals" section of Bill 03–1228 provides:

### Recitals

The applicant, Cresmont Properties LLC, is the owner of 2807 Cresmont Avenue, which is located in the Parking Lot District.

The owner has obtained a building permit to construct a 26–unit apartment building on the property *that includes a 33–space accessory parking lot,* and construction has commenced.

---

**20.** Section 1–102 of the Zoning Code defines "accessory":

"Accessory use" or "accessory structure" means a use or structure, respectively, that:

(1) serves and customarily is identical and subordinate to the principal use or structure;

(2) is subordinate in area, extent, or purpose to the principal use or structure;

(3) contributes to the comfort, convenience, or necessity of occupants, business, or industry in the principal use or structure served; and

(4) except in a planned unit development, is located on the same lot as the principal use or structure served.

> *By long-standing administrative practice by the City, required accessory parking uses do not require a Parking Lot Ordinance.* Certain individuals are, however, contesting the practice in court.
>
> To expedite the development of the apartment building, the applicant requests that this Ordinance be granted.

(emphasis added). Similarly, the Commission's 4 December staff report stated:

> The applicants are requesting this conditional use [B]ill because several community residents have taken this project to court regarding the use of an alley, and because they are concerned about this same group challenging them regarding the Parking Lot District provisions in the Zoning Code. *The City would not normally require this conditional use ordinance because the parking to be provided is accessory to the apartment building.* The applicants simply wish to ensure that they may proceed with their project and are willing to provide the higher level of scrutiny afforded the community in the ordinance process, if that would speed the project's implementation.

(emphasis added). The obvious intent of Bill 03–1228, as embodied in the "Recitals" section of the Bill, was to authorize Cresmont to proceed with its proposed development in accordance with the requirements of the Zoning Code, in particular § 10–201, which required accessory off-street parking to be provided for all newly-erected structures.[21] Before enactment of the change to the definition of "parking lot" in § 10–501 of the Zoning Code, the City was required by § 10–504 to issue an ordinance approving the use of land as a parking lot in the Parking Lot District—the District in which Cresmont's development is situated. *See* discussion *supra* Part I.B. Therefore, implicit in the City Council's understanding of the reason

---

**21.** As quoted, *supra*, in footnote 16, § 10–201 of the Zoning Code provides:

> For all newly-erected structures and all newly-established uses of land, accessory off-street parking facilities must be provided for that structure and use, as required by this title.

for enacting Bill 03–1228, as declared in the Commission's staff report, was the Council's finding that the parking lot being approved and authenticated by the Bill was accessory to the apartment building being constructed. Nothing in the record presented to this Court suggests that Petitioners challenged Bill 03–1228's applicability to the parking lot at issue here on the ground that the City Council's finding that the parking lot is accessory to the apartment building was erroneous, other than the bald assertions noted here.

### 2. Is The Parking Lot An Accessory Use To a Non–Permitted Structure?

Petitioners next assert that

Apart from any and all other considerations, in order to constitute a permitted "accessory" use under § 1–102 of the Zoning [Code] . . ., a parking lot must serve a permitted structure or use. *There is no such thing as lawful or permitted "accessory" parking to an unlawful or non-permitted structure or use.* Therefore, a threshold question to any determination of whether the parking lot at 2807 Cresmont Avenue is "accessory" or "non-accessory," for purposes of any current or retrospective application of the 2005 text amendment, is *the legal status of the structure or use allegedly served* by the parking lot. The City has conveniently ignored this threshold question, *which is the subject of a separate case.*

Even if the development at 2807 Cresmont Avenue were to survive the [Petitioners'] Open Meetings Act and Judicial Review challenges to the March 2004 conditional use authorization which facilitated its construction, the legal status of the principal structure and its use has been raised in the [Petitioners'] separate action for judicial review relating to permits issued in 2004. That case is presently before this Court as September 2008, No. 106. In that case, the [Petitioners] rely principally on a provision of the Baltimore City Zoning Ordinance expressly prohibiting the construction and use of a building far more than the number of families permitted under the bulk regulations. The [Peti-

tioners] have diligently and consistently pursued this issue since May of 2004.

Now that the separate action *has* reached this Court, should the permits for the principal structure at 2807 Cresmont Avenue and/or its use be deemed unlawful in that case, the already-constructed parking lot and related structures (fencing, light poles, etc.) would unquestionably constitute a "non-accessory" parking lot and could not escape the prerequisite of a lawfully granted conditional use authorization. If the parties hereto can agree on nothing else, they should at least agree that "non-accessory" parking lots in the Parking Lot District *require conditional use authorization.*

(emphasis in original) (citation and footnotes omitted).

Petitioners do not offer any authority, in the Zoning Code or other source, in support of this assertion. The short answer to Petitioners' contention is that we ruled against them today in their related, but separate, challenge to the apartment building as violating the Code's prohibition against the construction and use of a building for more than the number of families permitted under the bulk regulations. *Armstrong v. Mayor and City Council of Baltimore*, —— Md. ——, —— A.2d —— (2009) (No. 106, September Term, 2008) (slip op. at 30–38). The disposition of that case settles before us the only contention pending that attacks the legality of the apartment building on zoning grounds.

### 3. Do Sections 1–202 and 3–306(a) of the .Zoning Code Forestall Mootness?

Petitioners assert that two sections of the Zoning Code prohibit expressly retrospective application to the Cresmont development of the text amendment enacted under Ordinance 04–855. As this argument proceeds, application of the Baltimore City zoning scheme "as it exists" does not moot the validity of the authorization to construct the parking lot granted by the City Council through Ordinance 04–659 in March of 2004.

The first section of the Zoning Code upon which Petitioners rely is § 1–202. Section 1–202 provides:

Nothing in this article may be taken to be a consent, license, or permit to:

(1) use any property;

(2) locate, erect, or maintain any structure or facility; or

(3) carry on any trade, industry, occupation, or activity.

Petitioners maintain that under § 1–202, "no text amendment to the Zoning [Code] may be judicially determined to serve as, substitute for, or convey any construction or use permit."

Second, Petitioners pin their hopes on § 3–306(a). That section [22] provides:

(a) *Unlawful preexisting uses and structures.*

Any structure or use that is unlawfully existing:

_____

**22.** The entirety of § 3–306 of the Zoning Code provides:

(a) *Unlawful preexisting uses and structures.*
 Any structure or use that is unlawfully existing:
 (1) does not become lawful solely by the adoption of this article or any amendment to it; and
 (2) to any extent or manner that the unlawful structure or use is in conflict with the requirements of this article, that structure or use remains unlawful.
(b) *Lawful preexisting uses reclassified as conditional.*
 (1) If an existing lawful use is reclassified by this article as a conditional use in the district in which it is located, the use may be continued as a lawful conditional use subject to the conditions and restrictions previously imposed on it by law or regulation.
 (2) Any change to that use, including any expansion, relocation, or structural altercation, is subject to the procedures and requirements imposed by this article on conditional uses.
(c) *Nonconforming uses.*
If an existing lawful use is reclassified by this article or by any amendment to it so that it no longer is allowed in the district in which it is located, the use may be continued as a nonconforming use subject to the provisions of Title 13 of this article.
(d) *Preexisting lot of record.*
 (1) This subsection does not apply in an Industrial District.
 (2) On a lot that was established before April 20, 1971, a single-family dwelling may be established regardless of the minimum lot area requirements imposed by this article, as long as all other requirements of this article are met.

(1) does not become lawful solely by the adoption of this article or any amendment to it; and

(2) to any extent or manner that the unlawful structure or use is in conflict with the requirements of this article, that structure or use remains unlawful.

Petitioners argue that, by enacting §§ 1–202 and 3–306(a),[23] the City Council made a "legislative choice" to restrain itself from being able (1) to approve unlawfully a developer's application for a conditional use authorization—here the parking lot ordinance, Ordinance 04–659—to allow construction to commence, and then (2) later amend the zoning text so as to relieve the need for its prior action. This application should be an exception to the *Yorkdale* rule, so it goes, because the operative effect of these sections is to prevent subsequent text amendments to the Zoning Code from legitimating previously enacted, but unlawful, authorizations to construct developments.[24]

The City retorts that Petitioners misinterpret the intention of §§ 1–202 and 3–306(a) of the Zoning Code. With regard to

---

**23.** The predecessors to § § 1–202 and 3–306(a) of the current Zoning Code were adopted as part of the 1971 comprehensive zoning effort by the City, and appeared in the 1971 Zoning Code at § § 2.0–1(d) and 2.0–1(c), respectively. The 1971 Code was reenacted in 1999.

Section 2.0–1(d) of the 1971 Code provided:

d. *Ordinance Not a Permit.* Nothing contained in this ordinance shall be deemed to be a consent, license, or permit to use any property, or to locate, erect, or maintain any structure or facility or to carry on any trade, industry, occupation, or activity.

Section 2.0–1(c) of the 1971 Code provided:

c. *Unlawfully Existing Structures and Uses.* No structure or use which was not lawfully existing at the time of the adoption of this ordinance shall become or be made lawful solely by reason of the adoption of this ordinance; and to the extent that, and in any manner that, said unlawful structure or use is in conflict with the requirements of this ordinance, said structure or use remains unlawful hereunder.

**24.** Petitioners premise much of their theory on the basis that the parking lot at issue was constructed pursuant to an ordinance, Ordinance 04–659, which was later determined by the Circuit Court to have been enacted in violation of the Maryland Open Meetings Act. *See supra* Part I.B.

§ 1–202, the City contends that its plain meaning is simply that the existence of the Zoning Code, wherein lists of various uses of land are authorized (either as of right or by way of application to the Board or the City Council) does not eliminate the need for the use or structure to be in compliance with all other applicable laws and regulations, including obtaining the proper permits, or, in certain cases, obtaining a license or any other approval made necessary by some other pertinent part of the Baltimore City Code. The City describes that every decision by the Board recites similar language to inform applicants that even if an instant application is approved, the applicant, at a minimum, yet must obtain a permit from the pertinent authority.

■ With regard to § 3–306(a), the City imagines the logical extension of Petitioners' interpretation to mean that any structure or use unlawful at the time of the 1971 recodification of the Zoning Code [25] (or any amendment thereafter) remains unlawful even if the Zoning Code is changed subsequently to permit such a structure or use. Petitioners' interpretation, thus stated, is inconsistent with the legislative choice of the word "solely" in § 3–306(a)(1), or with § 3–306(a)(2)'s provision that "to any extent or manner that the unlawful structure or use is in conflict with the requirements of this article, that structure or use remains unlawful." A more logical reading of "solely" in subsection (a)(1) and the language of subsection (a)(2), according to the City, is that if a structure or use once prohibited is then made a permitted use, pursuant to a text amendment, the amendment does not otherwise free the structure or use from compliance with other requirements of the Zoning Code.

The City illustrates its interpretation of these sections:

A hypothetical example of how this might work follows. Assume for the moment that in 1971 retail uses were prohibited in certain districts of the City but that the owner of a property in such a district was nonetheless using the

---

**25.** *See supra* note 23.

property for retail. Assume also that in 1971 the City Council, as part of its comprehensive rezoning of the City in that year, made retail a permitted use in the hypothetical property's zoning district. Under [Petitioners'] theory of the meaning of § 3–306, the use of the property at issue would remain unlawful notwithstanding the change and the property would be forever locked into the prior zoning scheme. This was surely not the intention of the drafters of the 1971 Zoning Code. After all, when they comprehensively rezoned the City in 1971, they specifically intended that their changes would eliminate the prior zoning scheme. [Petitioners'] theory would contravene that intention.

The City's theory of the meaning of [§ 3–306(a) ] is that if the hypothetical use *independently violated some other provision* of the Zoning Code that had not been changed-e.g., setback requirements, floor area ratio, etc.-the use or structure would remain unlawful and would still have to adhere to this other requirement. Viewed in such manner, the City's theory gives specific meaning to the use of the word *"solely "* in § 3–306(a)(1) as well as the inclusion of the language in § 3–306(a)(2) as part of the provision.

(emphasis in original).

We agree with the City's interpretation of § § 1–202 and 3–306(a) of the Zoning Code. Although we are sympathetic to the Petitioners' position here because Ordinance 04–659, the ordinance pursuant to which the parking lot was constructed actually, later correctly was found to have been enacted in violation of the Maryland Open Meetings Act, Petitioners' interpretation of § § 1–202 and 3–306(a) is misguided. Use of the word "solely" in subsection (a)(1) of § 3–306 indicates an intention on the part of the City Council that any change to the Zoning Code that authorizes a structure or use that was not authorized properly under the Code prior to the text change does not otherwise free that use or structure from compliance with any other pertinent requirements of the Code. Subsection (a)(2) affirms this intention by advising expressly that regardless of whether a change in the text of the Code authorizes the use or structure, that use or structure

remains unlawful so long as it is in conflict with the other requirements of the Code. Also, § 1–202 simply provides that the text of the Zoning Code does not eliminate the need for the applicant to comply with the other requirements of the Baltimore City Code, including obtaining the proper permits, and any other approvals from the appropriate authorities, as provided in the City Code.[26] Were we to agree with Petitioners' interpretation, any change in the zoning text would not apply to any unlawful preexisting uses or structures to which the change in the text would be applicable. For obvious practical reasons, illustrated in the City's hypothetical, this is a result with which we cannot agree in the face of *Yorkdale* and *Layton.*[27]

## C. Attorney's Fees under the Maryland Open Meetings Act

Although we conclude that, under the *Yorkdale* rule, Petitioners' challenge to the validity of the City Council's authorization of the parking lot in Ordinance 04–659, in light of the Council's subsequent enactment of Ordinance 04–855, is moot, this is so only insofar as their challenge seeks to undo the

---

**26.** As iterated previously, § 1–202 of the Zoning Code provides:
> Nothing in this article may be taken to be a consent, license, or permit to:
> (1) use any property;
> (2) locate, erect, or maintain any structure or facility; or
> (3) carry on any trade, industry, occupation, or activity.

Section 1–202 seems to indicate that the change implemented by Ordinance 04–855 to the text of the Code does not eliminate the need for compliance with other requirements imposed by the Baltimore City Code, including the proper permits. Because the Circuit Court did not void Ordinance 04–659, the ordinance pursuant to which the permit for the parking lot was issued, in Petitioner's Open Meetings Act challenge, it would appear that the permit for the parking lot issued to Cresmont pursuant to Ordinance 04–659 remains valid.

**27.** Petitioners seek to limit the effect of their interpretation of §§ 1–202 and 3–306(a)—that subsequent text amendments to the Zoning Code do not legitimate unlawful preexisting uses and structures—by narrowing that interpretation to situations in which the preexisting use or structure was constructed pursuant to an approval later found to be invalid. *See supra* Part I.B and note 24. For the same reasons articulated above, we find this interpretation contradictory to the intention and purpose of §§ 1–202 and 3–306(a).

validity of the parking lot at the Cresmont complex. Whether Petitioners are entitled to attorney's fees and, if so, how much those fees should be, as awarded generally by the Circuit Court upon its conclusion that Petitioners' proved that the Committee's process leading to the adoption of Ordinance 04–659 violated the Maryland Open Meetings Act, is a separate and collateral consideration that remains to be decided finally by the trial judge. As noted at the outset of this opinion, we are not compelled here to reach the parties' questions in this regard, because of our holding as to mootness; however, we shall comment (admittedly as dicta) on the issue for guidance when this matter is considered by the trial judge.

■ The Maryland Open Meetings Act is found in the State Government Article in Title 10, Subtitle 5, §§ 10–501 to –512. *See, e.g.,* Md.Code, State Gov't Art. § 10–512 ("This subtitle may be cited as the 'Open Meetings Act.'"). The Act provides, in § 10–510(c), that "[i]n an action under this section, it is presumed that the public body did not violate any provision of this subtitle, and the complainant has the burden of proving the violation." Md.Code, State Gov't Art., § 10–510(c). Subsection (d) of § 10–510 grants the following powers to a court hearing an action brought by a complainant alleging that a public body violated the Act:

A court may:

(1) consolidate a proceeding under this section with another proceeding under this section or an appeal from the action of the public body;

(2) issue an injunction;

(3) determine the applicability of this subtitle to the discussions or decisions of public bodies;

(4) if the court finds that a public body willfully failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of this subtitle and that no other remedy is adequate, declare void the final action of the public body;

(5) as part of its judgment:

(i) assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred; and

(ii) require a reasonable bond to ensure the payment of the assessment; and

(6) grant any other appropriate relief.

Md.Code, State Gov't Art., § 10–510(d). In the present case, the Circuit Court determined that Petitioners proved that the Committee acted in violation of the Open Meetings Act. As part of its judgment, the Circuit Court awarded attorney's fees generally, pursuant to § 10–510, to Petitioners. The Court of Special Appeals reversed the Circuit Court's award of attorney's fees. The intermediate appellate court opined that, because Petitioners "did not obtain any of the relief that they requested," Petitioners were not "prevailing" parties under § 10–51 0(d)(5)(i), and thus did not qualify for an award of attorney's fees. For the reasons that follow, we reverse the judgment of the Court of Special Appeals regarding the award of attorney's fees.

Section 10–510(d)(5)(i)'s provision for an attorney's fees award in Open Meetings Act violation claims has been addressed by both Maryland appellate courts on several occasions. In *Malamis v. Stein*, 69 Md.App. 221, 516 A.2d 1039 (1986), the Court of Special Appeals considered "whether a trial judge must award attorney fees and other litigation expenses to the prevailing party" in an action brought pursuant to the Open Meetings Act. *Id.* at 222, 516 A.2d at 1040. The appellants in *Malamis* filed a petition in the Circuit Court challenging the actions of the Allegany County Board of Education in reaction to the flooding of one of the county schools. *Id.* at 222–23, 516 A.2d at 1040. The flooding of the school necessitated its closing and the reassignment of its students to other schools in Allegany County. *Id.* at 222–23, 516 A.2d at 1040. Three days after the flooding incident, a meeting was held involving Board officials, parents, and students to discuss the relocation assignment options. *Id.* at 223, 516 A.2d at 1040. During the meeting, the School Superinten-

dent informed those assembled that the final decision regarding reassignment of students would be made at a closed meeting to be held later that day. *Id.* at 223, 516 A.2d at 1040. At the closed meeting, a final decision was reached, and that decision was ratified subsequently at a regularly scheduled public meeting. *Id.* at 223, 516 A.2d at 1040.

Appellants alleged that the closed afternoon meeting violated the Open Meetings Act. *Id.* at 223, 516 A.2d at 1040. They sought a declaration holding that the Board's decision was invalid, an injunction against implementation of the plan, and an award of "the cost of this action, including reasonable attorneys' fees." *Id.* at 223–24, 516 A.2d at 1040–41. The trial court found that the Board violated the Open Meetings Act by having the closed hearing. *Id.* at 224, 516 A.2d at 1041. Consequently, the trial judge ordered the Board to conduct an open meeting for the purpose of adopting a plan of reassignment for the students. *Id.* at 224, 516 A.2d at 1041. He did not void, however, the plan in effect, which was to remain in effect until a new plan was adopted. *Id.* at 224, 516 A.2d at 1041. Concerning appellants' request for attorney's fees, the trial judge ruled:

> The Act provides that the Court as part of its judgment may assess against any party reasonable counsel fees that the party who prevails in the action incurs. The Court finds that while the Board failed to comply with the Sunshine Act its actions were not taken in bad faith nor with an intention to deceive the public. Rather, the Board acted to deal with an emergency situation in an expedited fashion and thereby overlooked statutory requirements. Therefore, the Court declines to award counsel fees in this case.

*Id.* at 224, 516 A.2d at 1041.

On appeal, the Court of Special Appeals affirmed the trial court's judgment, rejecting appellants' position that the award of attorney's fees was mandatory upon finding a violation of the Open Meetings Act. The intermediate appellate court,

applying the rules of statutory construction, resolved that the provision in the Act regarding attorney's fees is clear: "the legislature intended that trial judges determine, in their discretion, whether the circumstances warrant the award of attorney's fees or other expenses of litigation." *Id.* at 227, 516 A.2d at 1042. Concerning the standard of review for that trial court decision, the *Malamis* court added:

> We do not find the denial of attorney fees and other expenses to be an abuse of discretion. Where the trial judge has discretion to award attorneys fees, his or her exercise of that discretion will not be overturned unless clearly erroneous. *See Dent v. Simmons*, 61 Md.App. 122, 127, 485 A.2d 270 (1985). Moreover, the exercise of that discretion is "presumed to be correct until the attacking party has overcome such presumption by clear and convincing proof of an abuse." *Langrall, Muir & Noppinger v. Gladding*, 282 Md. 397, 401, 384 A.2d 737 (1978). *See I.W. Berman Prop. v. Porter Bros.*, 276 Md. 1, 19–20, 344 A.2d 65 (1975). No such clear and convincing proof has been presented here. Accordingly, neither the trial judge's finding that the Board did not act in bad faith or to deceive the public, nor his reliance on such finding to support his refusal to award attorneys fees is clearly erroneous.

*Id.* at 227–28, 516 A.2d at 1042–43 (footnote omitted).

Over a decade later, this Court decided *Wesley Chapel Bluemount Ass'n v. Baltimore County*, 347 Md. 125, 699 A.2d 434 (1997). There, the issue was whether the Baltimore County Board of Appeals was required by the Open Meetings Act to deliberate in open session when considering an appeal from a hearing officer's approval of a land development plan. *Id.* at 127, 699 A.2d at 435. We concluded that the Open Meetings Act applies to consideration of development plans, and, thus, required the board to deliberate in open session. *Id.* On the issue of attorney's fees, the Court declined to affirm the trial court's award of attorney's fees in favor of the petitioner, however, because the trial court's judgment did not

comport with the findings required for the relief sought under the Open Meetings Act.[28] Nevertheless, the Court provided instructive guidance to assist the trial court in its reconsideration of the attorney's fee issue:

> Although, as we have indicated, an assessment of attorney's fees under § 10–510(d)(5) does not depend on a finding of willfulness, the animus of the board, if any, would certainly be a factor to consider. We do not believe that the Legislature intended for such assessments to be automatic upon a finding of a violation, for that would require the diversion of scarce public funds for fee-shifting purposes merely because a public body guessed wrong on the eventual outcome of a legal issue. Courts considering fee assessments need to take into account, among other things, whether, how, and when the issue of a closed session or other prospective violation was presented to the public body, the basis, if any, the public body gave for concluding that its action was permissible under the Act, whether that basis was a reasonable one under the law and the circumstances, whether the amounts claimed are reasonable, and the extent to which all parties acted in good faith. The circuit court will have an

---

28. The trial court ruled that the petitioner proved that the Board of Appeals was required to deliberate in open session, and that, by failing to do so, the Board acted in violation of the Open Meetings Act. *Wesley Chapel*, 347 Md. at 136, 699 A.2d at 439. The trial court remanded the case to the Board for further proceedings, thereby effectively voiding the Board's prior decision, and ruled that the County had to pay petitioners' counsel 65% of his attorney's fees. *Id.* The Court of Special Appeals reversed, concluding that the Open Meetings Act was not applicable to the Board's actions because review of a development plan is not a "zoning matter" within the meaning of § 10–503(b)(2) of the Act. *Id.* This Court reversed the intermediate appellate court, concluding that review of a development plan is a "zoning matter" within the meaning of the statute. *Id.* at 127, 699 A.2d at 435. We declined to affirm the judgment of the Circuit Court, however, because of that court's failure to make specific findings reflecting whether the statutory conditions to void an action taken in violation of the Act were present, and because it was not clear whether the issue of attorney's fees, in light of the Court of Special Appeals's judgment on the merits of the applicability of the Open Meetings Act, was properly before the Court. *Id.* at 149–50, 150 n. 14, 699 A.2d at 446, 446 n. 14.

opportunity to do that and to make appropriate findings when the case is remanded to it.

*Id.* at 150, 699 A.2d at 446 (footnote omitted).

In 1999, the Court of Special Appeals visited again § 10–510's attorney's fees provision, in *Andy's Ice Cream, Inc. v. City of Salisbury,* 125 Md.App. 125, 724 A.2d 717 (1999). Andy's Ice Cream brought an action against the Salisbury Zoo Commission, Inc., asserting that the Commission, in a closed meeting, failed to comply with the Public Information Act[29] and the Open Meetings Act in the course of awarding a food concession contract to Andy's competitor. *Id.* at 131, 724 A.2d at 719–20. Andy's sought a declaratory judgment and an injunction against the Commission's decision to award the contract to the competitor. *Id.* at 131, 724 A.2d at 720. All parties sought attorney's fees. *Id.* The Circuit Court concluded that there was no Open Meetings Act violation because the Act did not apply to the Commission. *Id.* at 159, 724 A.2d at 733. No attorney's fees were awarded to any party. *Id.* at 131, 724 A.2d at 720. The Court of Special Appeals reversed the judgment of the Circuit Court with regard to the Open Meetings Act, concluding that the Act was applicable to the Commission, and that the Commission violated the Act by making the award decision in a closed meeting. *Id.*

Regarding the issue of the appropriate remedy for violation of the Open Meetings Act, the Court of Special Appeals concluded that, because the City Council of Salisbury could not delegate lawfully to the Zoo Commission the discretionary power to award the franchise at issue, there was "no need to declare the final action of the [C]ommission void pursuant to the provisions of § 10–510(d)(4)." *Id.* at 159, 724 A.2d at 733–34. With regard to the issue of attorney's fees, however, the intermediate appellate court informed the trial court that, on remand, "it would be appropriate to re-consider the issue of attorneys' fees as to th[e Open Meetings Act] issue." *Id.* at 167, 724 A.2d at 737.

---

29. The Public Information Act is codified at § § 10–611 to -628 of the State Government Article.

A close examination of these cases [30] suggests to us that the Court of Special Appeals erred in the present case when it concluded that, for the purposes of § 10–510(d)(5)(i)'s provision for the award of attorney's fees, a party bringing an action alleging an Open Meetings Act violation must obtain the relief it requests on the merits of its claim in order to be

---

**30.** Petitioners also rely on the Court of Special Appeals's opinion in *Suburban Hospital, Inc. v. Maryland Health Resources Planning Commission,* 125 Md.App. 579, 726 A.2d 807 (1999), *vacated,* 364 Md. 353, 772 A.2d 1239 (2001), in support of their position. The pertinent facts of that case do not warrant recitation here because, on 28 June 1999, we granted a petition for writ of certiorari to review the decision of the intermediate appellate court. *See Md. Health Res. v. Suburban Hosp.,* 354 Md. 570, 731 A.2d 969 (1999). On 5 June 2001, however, we issued an Order vacating the judgment of the Court of Special Appeals and remanding the case to the intermediate appellate court with directions to vacate the decision of the Circuit Court for Baltimore City and remand the case to the Circuit Court with directions to dismiss the action on the grounds of mootness. *Md. Health Res. Planning Comm'n v. Suburban Hosp., Inc.,* 364 Md. 353, 353–54, 772 A.2d 1239, 1239 (2001). Notwithstanding questionable reliance on the reported decision of the Court of Special Appeals on the merits of the Open Meetings Act claim under those circumstances, we find that the intermediate appellate court set forth accurately the policy underlying the pertinent requirements of the remedies provided in § 10–510(d):

> The Commission's arguments fail in several respects. First, the requirement that a public body must have acted "willfully" only applies to attempts to *void* the public body's acts. The circuit court interpreted "willfully" as "knowingly," and then found that the Commission had therefore not willfully violated S.G. §§ 10–505, 506, 507, or 509(c). Because of this conclusion, the trial court refused the discretionary option, offered to it by S.G. § 10–510(d)(4), of voiding the Commission's actions.
>
> State Government § 10–510(d)(2), (3), (5), and (6), however, which provide for injunctive relief, declaratory relief, attorneys' fees, and "any other appropriate relief," respectively, do not require the same finding that the public body "willfully failed" to comply with the Open Meetings Act that § 10–510(d)(4) requires. *See Wesley Chapel Bluemount Association, et al. v. Baltimore County,* 347 Md. 125, 149, 699 A.2d 434 (1997). In addition to being apparent on the face of § 10–510(d), this is evident from the public policy reality that enjoining a public body's action, or issuing a declaratory judgment action, will be less disruptive and more conducive to a balance between citizen complaints and government efficiency than would be voiding the public body's actions. Simply put, under the Open Meetings Act, injunctions and declaratory relief are available for a lower threshold of violation than that needed to void a public body's action.

*Suburban Hosp., Inc.,* 125 Md.App. at 590, 726 A.2d at 812.

deemed the "prevailing" party. In none of the three cases on point did an appellate court of this State interpret the qualifier "prevails" in § 10–510(d)(5)(i) to mean that a party had to achieve the relief it requested on the merits of its claims. In fact, in two of the cases, the appellate courts acknowledged implicitly that, because the petitioners/appellants proved that the actions taken by the pertinent governmental bodies violated the Open Meetings Act, the trial courts in those cases, on remand, could consider the issue of attorney's fees separate and distinct from any other relief sought by the petitioners/appellants.[31]

■ Of greater consequence, the intermediate appellate court's decision here conflicts with the purpose and goals of the Open Meetings Act. We discussed in *Wesley Chapel* the intention at the heart of the Act:

> This case is governed by four sections of the State Open Meetings Act, codified as Maryland Code (1995 Repl. Vol.), §§ 10–501 through 10–512 of the State Government Article. Section 10–501 recites the legislative policy behind the Act. It begins by declaring essential to the maintenance of a democratic society that, except in special and appropriate circumstances, public business be performed in an open and public manner and that citizens be allowed to observe the

---

31. In *Wesley Chapel*, we directed the remand of the case to the trial court to reconsider whether the requisite circumstances for awarding either or both of two remedies, voiding the government body's offending action and awarding attorney's fees to the petitioners, were satisfied. In so doing, this Court highlighted the separate findings and determinations the trial court should reach in resolving the two possible remedies. *See Wesley Chapel*, 347 Md. at 149–50, 699 A.2d at 446. In *Andy's Ice Cream*, the Court of Special Appeals concluded that the trial court's reconsideration of the voidability issue was not necessary, but, nevertheless, it would be appropriate for the trial court to reconsider Andy's claim for attorney's fees. *See Andy's Ice Cream, Inc.*, 125 Md.App. at 167, 724 A.2d at 737. The Court of Special Appeals's decision in *Malamis* is not inconsistent. Although the intermediate appellate court did not disturb the trial court's conclusion that the governmental body's actions violated the Open Meetings Act, it agreed with the trial judge's decision not to award attorney's fees to appellants because such a remedy was not warranted under those circumstances. *See Malamis*, 69 Md.App. at 227–28, 516 A.2d at 1042–43.

performance of public officials and the deliberations that go into the making of public policy. It then expresses the truism that the ability of the public to attend and report on meetings of public bodies and to witness their deliberations ensures the accountability of government and increases the faith of the public in government. That legislative policy undergirds and pervades the Act and necessarily sets the general direction for its interpretation.

*Wesley Chapel,* 347 Md. at 127–28, 699 A.2d at 435. With regard to the enforcement provision of the Act, § 10–510, we stated:

[Section 10–510] provides for enforcement of the Act. Section 10–510(b) allows a person adversely effected by an alleged violation of the Act to file a petition in the circuit court to determine the applicability of the Act, to require the public body to comply with the Act, and to void an action of the public body taken in violation of the Act. Section 10–510(d) permits the court to issue an injunction and determine the applicability of the Act but allows it to void the action complained of only if it finds that the public body "willfully failed to comply" with the Act and that no other remedy is adequate. § 10–503(d)(4). As part of its judgment, *whatever it may be,* the court is permitted under § 10–510(d)(5) to assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred and to require a reasonable bond to ensure payment of the assessment. Section 10–510(d)(5) does not, *on its face,* require a finding of willfulness as a precondition to the assessment of counsel fees and litigation expenses.

*Id.* at 128–29, 699 A.2d at 436 (emphasis added). Thus, a goal of the Act is to ensure that public business be performed in an open and public manner, to the end that such discourse increases both the accountability of government and the faith of the public in that government.

■ One of the means by which the Legislature chose to reach this goal was to authorize enforcement of the Act's

provisions by persons "affected adversely," including, among others, granting those persons the potential to be awarded attorney's fees if they "prevail[ ] in the action." Md.Code, State Gov't Art. § 10–510(b)(1), (d)(5). In light of the Act's goals and purpose, as described above, we interpret the qualifier "prevails" as being determinable according to the parties' respective success litigating the seminal Open Meetings Act violation claim,[32] regardless of the specific remedies sought, or whether any or all of those remedies are achieved. To conclude otherwise that the non-governmental party qualifies as a "prevailing" party only if that party obtains an injunction, a declaration of invalidity of the legislative act, or achieves other remedies following establishment of the merits of its foundational claim seems to us to run counter to the intent of the Act for two reasons.

First, if the non-governmental party sought any remedy other than attorney's fees, the intermediate appellate court's interpretation of "prevails" would seem to limit the discretion of trial judges to award attorney's fees to the non-governmental party to only those actions in which the non-governmental party succeeded in securing all of the substantive relief sought.[33] Such a limitation conflicts with prior judicial interpretations of § 10–510(d), which make clear that discretion remains with trial judges with regards to § 10–510(d)(5)(i)'s provision for awarding attorney's fees. *See Wesley Chapel,* 347 Md. at 129, 699 A.2d at 436 ("As part of its judgment, whatever it may be, the court is permitted under § 10–510(d)(5) to assess against any party reasonable counsel fees

---

**32.** This interpretation entails that the non-governmental challenger "prevails" by proving that the governmental body acted in violation of the Open Meetings Act. *See* Md.Code, State Gov't Art., § 10–510(c) ("In an action under this section, it is presumed that the public body did not violate any provision of this subtitle, and the complainant has the burden of proving the violation.").

**33.** We note that under § 10–510(d), the three other substantive remedies a court may grant are: (2) to issue an injunction; (4) to void the public body's action upon a finding of willful failure to comply with the relevant sections of the Act; and (6) to grant any other appropriate relief. Md. Code, State Gov't Art., § 10–510(d).

and other litigation expenses that the party who prevails in the action incurred and to require a reasonable bond to ensure payment of the assessment."); *Malamis,* 69 Md.App. at 227, 516 A.2d at 1042 ("[T]he legislature intended that trial judges determine, in their discretion, whether the circumstances warrant the award of attorney's fees or other expenses of litigation."). Our ruling here does not mean necessarily that it would be an abuse of discretion for a trial judge to deny attorney's fees to a litigant who proves a violation of the Act. Each case will rise or fall on its own unique circumstances and the trial court's articulated or discernable exercise of discretion.

Second, because the remedy of voiding the public body's action under § 10–510(d)(4) requires a finding that the public body *willfully* failed to comply with the pertinent sections of the Act, in those cases in which the non-governmental party seeks that remedy, under the intermediate appellate court's interpretation of "prevails," the non-governmental party would not be eligible for attorney's fees unless willfulness was found. That interpretation was rejected by this Court in *Wesley Chapel,* where we made clear that the willfulness standard is not applicable to analysis of the challenging party's request for attorney's fees. *See Wesley Chapel,* 347 Md. at 129, 699 A.2d at 436 ("Section 10–510(d)(5) does not, on its face, require a finding of willfulness as a precondition to the assessment of counsel fees and litigation expenses.").

■ Finally, our interpretation of "prevails" most befittingly incorporates § 10–510(c)'s provision that "[i]n an action under this section, it is presumed that the public body did not violate any provision of th[e Act], *and the complainant has the burden of proving the violation."* Md.Code, State Gov't Art., § 10–510(c) (emphasis added). In light of § 10–510(c), to conclude other than as we do here would violate one of the cardinal rules of statutory interpretation of "ensur[ing] that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Jackson v. State,* 408 Md. 231, 236–37, 969 A.2d 277, 281 (2009) (quoting *Int'l Ass'n*

*of Fire Fighters, Local 1715 v. Mayor of Cumberland,* 407 Md. 1, 9, 962 A.2d 374, 378 (2008)).[34] Accordingly, the Circuit

---

**34.** We pause to address briefly the cases relied upon by the Court of Special Appeals, as well as the City, in support of the position that "prevails" in § 10–510(d)(5)(i) should be interpreted in terms of whether the complainants obtain the relief they requested. In reaching its judgment, the Court of Special Appeals relied mainly on three cases which held, in their respective contexts, that plaintiffs could not be considered "prevailing" parties because they did not receive any of the relief they sought on the merits. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (holding that, with respect to the plaintiff's claim for attorney's fees in the plaintiff's action under the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act of 1990, the term "prevailing party" does not authorize an award of attorney's fees without a corresponding alteration in the legal relationship of the parties), *superseded by statute,* 5 U.S.C. § 552(a)(4)(E); *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) (holding that, with respect to the plaintiff's claim for attorney's fees in the plaintiff's 42 U.S.C. § 1988 action for vindication of civil rights, "a plaintiff [must] receive at least some relief on the merits of his claim before he can be said to prevail"), *overruled in part on other grounds by Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Settlemire v. D.C. Office of Employee Appeals,* 898 A.2d 902, 907 (D.C.2006) (holding that, in a government employee's pursuit of an appeal to the Office of Employee Appeals, "a party's interest in pursuing litigation in order to be awarded attorney's fees cannot by itself create the requisite live controversy 'where none exists on the merits of the underlying claim' ").

In addition to *Hewitt* and *Buckhannon Board & Care Home,* the City points to three similar cases upon which it relies. *See Ruckelshaus v. Sierra Club,* 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (holding that, with respect to the plaintiff's claim for attorney's fees in the plaintiff's action under the Clean Air Act, "absent some degree of success on the merits by the claimant, it is not 'appropriate' for a federal court to award attorney's fees under § 307(f) [of the Clean Air Act]"); *Hanrahan v. Hampton,* 446 U.S. 754, 757–58, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam) (holding that, with respect to the plaintiff's claim for attorney's fees in the plaintiff's action under the Civil Rights Attorney's Fees Awards Act of 1976, "[i]t seems apparent from these passages that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims"); *S–1 & S–2 v. State Bd. of Educ.,* 21 F.3d 49, 51 (4th Cir.1994) (en banc) (per curiam) (holding that, with respect to the plaintiffs' claim for attorney's fees in the plaintiffs' action under the Education of the Handicapped Act, the dismissal of the appeal for prudential reasons as moot prevents the plaintiffs from being found prevailing parties, with the result that plaintiffs are not entitled to an award of attorney's fees as provided in the Act).

Court for Baltimore City must resolve finally its general attorney's fees award.[35]

---

We recognize the similarity between the discretionary language of § 10–510(d)'s provision for awarding attorney's fees and the discretionary language employed by Congress interpreted in the cases enumerated above. *See, e.g.,* 42 U.S.C. § 1988(b) (2006) ("In any action to enforce a provision of ... the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 40302 of the Violence Against Women Act of 1994, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...."). The Court of Special Appeals and the City, however, do not articulate why § 10–510(d)(5)(i)'s "prevails" should be interpreted similarly to the precedents noted above, other than by noting the similar language in the respective statutes. Neither the City nor the intermediate appellate court addressed or mentioned § 10–510(c)'s explicit presumption in actions under the Open Meetings Act—that the public body did not violate any provision of the Act—including why that presumption should have no bearing on the Legislature's intended meaning of "prevails." Additionally, the Court of Special Appeals previously rejected an attempt to liken § 10–510(d)(5)(i) to comparable provisions in federal statutes:

> We do not take lightly appellants' approach to the issue of attorney fee awards pursuant to § 10–510[ (d) ](5)(i). We recognize, however, as we must, that the federal cases relied upon by appellants involve an act and issues unlike that presented here. These cases involved litigation brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1981–1986 and attorneys fee awards sought pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *See, e.g.[,] Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (relationship between success in the Civil Md.Code, State Gov't Art., § 10–510(d). Rights litigation and the amount of the fee award); *Coen v. Harrison County School Board,* 638 F.2d 24, 27 (5th Cir.1981) (definition of "prevailing party" as used in § 1988); *Bagby v. Beal,* 606 F.2d 411, 414 (3rd Cir.1979) (same, and the appropriateness of the fee award in that case). We further are aware that the legislative history of § 1988, which, like § 10–510[ (d) ](5)(i), uses discretionary language, at least in part, accounts for the interpretation placed upon the act by the Courts which have considered it. *See, e.g., Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937. We have been provided with no comparable legislative history for § 10–510[ (d) ](5)(i). There is, moreover, a significant difference between the rights, the abridgement of which the Civil Rights Act of 1871 is designed to prevent[,] and those which are sought to be protected by the [Open Meetings Act]. Thus, there is a rational basis for interpreting the fee award provisions differently.

*Malamis,* 69 Md.App. at 228–29, 516 A.2d at 1043 (footnotes omitted).

**35.** That the Circuit Court did not render a finding on the issue of willfulness is rendered moot by our decision in this case. *Cf. Andy's Ice*

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTION TO DISMISS THE APPEALS; COSTS TO BE PAID ⅓ BY PETITIONERS AND ⅔ BY THE MAYOR AND CITY COUNCIL.**

*Cream, Inc.*, 125 Md.App. at 159, 724 A.2d at 733–34 ("[I]n light of our decision on the issue of delegation, . . . there will be no need to declare the final action of the [C]ommission void pursuant to the provisions of § 10–510(d)(4).").